UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| JUSTIN TUSSEY, Individually and on Behalf of All Others Similarly Situated, ) ) ) | CIVIL ACTION NO. 3:22-CV-00186 |
| Plaintiff, ) ) | CLASS ACTION COMPLAINT |
| vs. ) ) | |
| PRATT & WHITNEY DIVISION, RAYTHEON TECHNOLOGIES CORPORATION, QUEST GLOBAL SERVICES-NA, INC., BELCAN ENGINEERING GROUP, LLC, CYIENT, INC., PARAMETRIC SOLUTIONS, INC., AGILIS ENGINEERING, INC., MAHESH PATEL, ROBERT HARVEY, HARPREET WASAN, STEVEN HOUGHTALING, THOMAS EDWARDS, and GARY PRUS, ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) ) | DEMAND FOR JURY TRIAL |

Plaintiff Justin Tussey, individually and on behalf of a class of similarly situated individuals, brings this action for damages and injunctive relief under the antitrust laws of the United States for actual damages, treble damages declaratory and injunctive relief, costs of suit, pre- and post-judgment interest, and other relief and alleges as follows.

**INTRODUCTION**

1.     This is a class action under the Sherman Act which challenges an illegal conspiracy among Raytheon Technologies Corporation (defined below) and several outsource engineering suppliers (*i.e.*, the Supplier Defendants as defined below) to restrict the hiring and recruiting of engineers and other skilled laborers working on aerospace projects ("Engineers") among their respective companies (the "No-Poach Agreement").

2.     The Defendants (defined below) entered into and maintained this No-Poach Agreement at least as early as 2011 and continued it until at least 2019.  Throughout this time, and indeed until just recently when indictments against several of the Individual Defendants (defined below) were unsealed, Defendants concealed their No-Poach Agreement from their employees and independent contractors.

3.     The scope of the No-Poach Agreement was broad, covering at least all Engineers employed by (or working as an independent contractor for) Defendants to work on P&W (defined below) projects and statements of work in the United States and its territories.

4.     This No-Poach Agreement was intended to, and did, reduce competition for Engineers' services and, as a result, suppressed the job mobility of and compensation to Plaintiff and the members of the proposed Class (defined herein) below the levels that would have prevailed but for the illegal No-Poach Agreement.

5.     Defendants reached their unlawful horizontal agreement at the highest levels of their organizations, through verbal agreements that were later confirmed by Defendants, by their conduct

and in their emails, which they agreed to conceal from outsiders, from their respective employees who make up the proposed Class, and from the public.  As described below, Defendants' senior executives periodically reaffirmed, monitored, and policed the No-Poach Agreement.

6.      The No-Poach Agreement was exposed on December 9, 2021, when the United States Department of Justice ("DOJ") partially unsealed a criminal antitrust action against the former Director of Global Engineering Sourcing at P&W, Mahesh Patel.  In a supporting affidavit filed by the Defense Criminal Investigative Service of the United States Department of Defense, Office of Inspector General ("DCIS"), the DOJ (and DCIS) alleged that Patel conspired with the Supplier Defendants to restrict the hiring and recruiting of Engineers with the goal and effect of suppressing Engineers' compensation wages.  *See* Aff. in Supp. of Criminal Compl. and Arrest Warrant, *United States v. Patel*, No. 3:21-mj-1189, ECF No. 15 (D. Conn. Dec. 9, 2021) ("DCIS Affidavit").

7.      Then, on December 15, 2021, the DOJ filed an indictment, naming Patel, as well as Robert Harvey, Harpreet Wasan, Steven Houghtaling, Thomas Edwards, and Gary Prus as defendants (all of which are named as Individual Defendants herein), and charging them with one count of violating §1 of the Sherman Act, 15 U.S.C. §1.  The indictment quotes extensively from email correspondence among the Individual Defendants, in which they discuss, memorialize and police the No-Poach Agreement alleged in this Complaint (hereafter the "December 15 Indictment").

8.      The DCIS Affidavit and the December 15 Indictment outline how Defendants, through their officers, directors, agents, employees, or representatives, agreed not to compete for the services of each other's Engineers, specifically by agreeing to restrict the hiring and recruiting of Engineers between and among Suppliers in the United States and its territories.

9.      The No-Poach Agreement resulted in hiring and recruiting restrictions, which had the common purpose of limiting competition for, and thereby restricting the free movement and compensation of, Engineers within the aerospace engineering industry.  The No-Poach Agreement

artificially reduced or eliminated Engineers' ability to obtain better terms of employment, including compensation, at current and future employers.

10.     The hiring and recruiting restrictions that make up the No-Poach Agreement resulted from Defendants' shared financial motivations, specifically a desire to suppress wages and thereby lessen their own labor costs in fulfillment of aerospace contracts.

11.     Defendants monitored each other's compliance with the unlawful No-Poach Agreement and communicated to enforce compliance.  For instance, Defendants repeatedly reported perceived rule breaking by their co-conspirators to Patel.  And as Patel had the ability to punish violators by withholding future lucrative work from the violator, he was integral in ensuring that any violations of the No-Poach Agreement cease forthwith.

12.     Defendants directly linked the operations of the No-Poach Agreement to the financial benefits that would accrue to them from suppressing wages, noting, for example, that discipline in "'not hir[ing] any partners employee'" was essential to "'pre[v]ent poaching and price war.'"  DCIS Affidavit, ¶24.

13.     Given that the No-Poach Agreement was made and enforced confidentially and at the highest levels of the organizations, Defendants succeeded in concealing it from Plaintiff and the members of the Class.  Not until the DOJ's criminal investigation of Patel, and the resulting filing of the DCIS Affidavit and December 15 Indictment exposing the No-Poach Agreement became public did the existence of the anticompetitive No-Poach Agreement come to light.

14.     Defendants were aware that their conduct was illegal.  On multiple occasions, they internally raised concerns that restricting the hiring of employees under the No-Poach Agreement was illegal.

15.     The No-Poach Agreement at issue in this case reduced competition for aerospace Engineers and, as a result, it reduced Plaintiff's job mobility and enabled Defendants to pay their

employees, including Plaintiff and members of the Class, less than they would have been paid absent the No-Poach Agreement.  The No-Poach Agreement is thus a *per se* unlawful restraint of trade under the federal antitrust laws and injured Plaintiff and the members of the Class.  Plaintiff seeks injunctive relief and damages for violations of §1 of the Sherman Act, 15 U.S.C. §1.

## THE PARTIES

### A.    Plaintiff

16.    Plaintiff Justin Tussey ("Plaintiff") is a citizen and resident of the State of Florida. Plaintiff was employed as an Engineer for PSI beginning in February 2017 and continuing through November 2021, working on P&W projects during the 2017-2019 time period.  Plaintiff applied for engineering positions at another Defendant during the time period at issue, and was never contacted about those employment opportunities.  As a result, Plaintiff was injured in his business or property by the illegal conduct alleged in this Complaint.

### B.    Defendants

17.    Defendant Pratt & Whitney Division ("Pratt & Whitney" or "P&W") is a subsidiary of defendant Raytheon Technologies Corporation ("Raytheon Technologies") and is incorporated in Delaware with its principal place of business in East Hartford, Connecticut.  Pratt & Whitney is one of the largest aerospace engine design, manufacture, and service companies in the United States. During the Class Period, Pratt & Whitney and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States.  Pratt & Whitney is, on information and belief, identified as "Company A" as alleged in the DCIS Affidavit.  *See* DCIS Affidavit, ¶5.

18.    Defendant QuEST Global Services-NA, Inc. ("QuEST") is incorporated in Ohio with its principal place of business in East Hartford, Connecticut.  During the Class Period, QuEST and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid

wages, salaries, and/or benefits to Class members in the United States. QuEST is, on information and belief, identified as "Company B" in the DCIS Affidavit. *See* DCIS Affidavit, ¶6(a).

19.     Defendant Belcan Engineering Group, LLC ("Belcan") is incorporated in Ohio with its principal place of business in Windsor, Connecticut. During the Class Period, Belcan and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States. Belcan is, on information and belief, identified as "Company C" in the DCIS Affidavit. *See* DCIS Affidavit, ¶6(b).

20.     Defendant Cyient, Inc. ("Cyient") is incorporated in California with its principal place of business in East Hartford, Connecticut. Prior to 2014, Cyient was known under a different corporate name, Infotech Enterprises, Limited. During the Class Period, Cyient and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States. Cyient is, on information and belief, identified as "Company D" in the DCIS Affidavit. *See* DCIS Affidavit, ¶6(c).

21.     Defendant Parametric Solutions, Inc. ("PSI") is incorporated in Florida with its principal place of business in Jupiter, Florida. During the Class Period, PSI and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States. PSI is, on information and belief, identified as "Company E" in the DCIS Affidavit. *See* DCIS Affidavit, ¶6(d).

22.     Defendant Agilis Engineering, Inc. ("Agilis") is incorporated in Florida with its principal place of business in Palm Beach Gardens, Florida. During the Class Period, Agilis and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States. Agilis is, on information and belief, identified as "Company F" in the DCIS Affidavit. *See* DCIS Affidavit, ¶6(e).

23.     Defendants QuEST, Belcan, Cyient, PSI, and Agilis are referred to collectively as the "Suppliers" or "Supplier Defendants."

24.     Defendant Mahesh Patel ("Patel") is a natural person who resides in Glastonbury, Connecticut.  Patel was the Manager and Director of the Pratt & Whitney unit that managed the relationship between Pratt & Whitney and its suppliers.  He was the highest-ranking employee within that unit and managed a team of associates from his office in East Hartford, Connecticut. Patel was the main enforcer of Defendants' illegal agreement and served as an intermediary for communications between co-conspirators.  Patel left Pratt & Whitney in March 2020.

25.     Defendant Robert (Bob) Harvey ("Harvey") is natural person residing in Farmington, Connecticut.  Beginning in 2010, Harvey worked for QuEST as Senior V.P., then President-Strategic Accounts, and, as of 2019, President-Global Business Head.  Harvey worked principally from an office in East Hartford, Connecticut.  From 1998 to 2000, Harvey worked for Pratt & Whitney as a Senior V.P.  Harvey, on information and belief, is identified in the DCIS Affidavit as "Co-Conspirator 1."  *See* DCIS Affidavit, ¶8(a).

26.     Defendant Harpreet Wasan ("Wasan") is a natural person residing in South Glastonbury, Connecticut.  Beginning in early 2015, Wasan was V.P./Strategic Client Partner at QuEST, and worked principally from offices in East Hartford, Connecticut and Tokyo, Japan.  He left QuEST in early 2021.  Prior to his roles at QuEST, Wasan worked at Pratt & Whitney for approximately ten years.  Wasan, on information and belief, is identified in the DCIS Affidavit as "Co-Conspirator 3."  *See* DCIS Affidavit, ¶8(c).

27.     Defendant Steven Houghtaling ("Houghtaling") is a natural person and resident of Connecticut.  In 2013, he began working for Belcan as a General Manager, and was promoted to V.P. in 2015.  Since 2019, he has served as Belcan's Senior V.P., working principally from an office

in Windsor, Connecticut.  Houghtaling, on information and belief, is identified in the DCIS Affidavit as "Co-Conspirator 5."  *See* DCIS Affidavit, ¶8(e).

28.     Defendant Thomas Edwards ("Edwards") is a natural person and resident of Connecticut.  Starting in or around 2010, Edwards was employed at the company now known as Cyient, and since around 2013, has been President for Cyient's North America operations.  He worked principally from an office in East Hartford, Connecticut.  Edwards, on information and belief, is identified in the DCIS Affidavit as "Co-Conspirator 6."  *See* DCIS Affidavit, ¶8(f).

29.     Defendant Gary Prus ("Prus") is a natural person and resident of Florida.  Beginning at least as early as 2015, Prus was Chief Operating Officer ("COO")/Executive V.P. and part owner of PSI, and worked principally from an office in Jupiter, Florida.  Prior to his employment with PSI, Prus worked for 18 years at Pratt & Whitney.  Prus, on information and belief, is identified in the DCIS Affidavit as "Co-Conspirator 7."  *See* DCIS Affidavit, ¶8(g).

30.     Defendants Patel, Harvey, Wasan, Houghtaling, Edwards, and Prus are referred to collectively as the "Individual Defendants."

31.     Defendants Pratt & Whitney, Raytheon Technologies, the Supplier Defendants, and the Individual Defendants are referred to collectively as "Defendants."

## JURISDICTION AND VENUE

32.     Plaintiff brings this action to recover treble damages, costs of suit, and reasonable attorneys' fees, arising from Defendants' violations of §1 of the Sherman Act, 15 U.S.C. §1.

33.     The Court has subject matter jurisdiction pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, and 28 U.S.C. §§1331 and 1337.

34.     Venue is proper in this judicial district pursuant to §12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §1391(b) because a substantial part of the events giving rise to Plaintiff's claims

occurred in this District and a substantial portion of the affected interstate trade and commerce was carried out in this District.

## FACTUAL ALLEGATIONS

35.     In 2016, the DOJ and United States Federal Trade Commission ("FTC") issued guidance about the anticompetitive effects of no-poach agreements like the one at issue in this case. The guidance made clear that agreements between employers not to solicit or hire each other's employees "eliminate competition in the same irredeemable way as agreements to fix product prices or allocate customers, which have traditionally been criminally investigated and prosecuted as hardcore cartel conduct."[1]

36.     Defendants' No-Poach Agreement has substantially affected interstate commerce and has caused antitrust injury throughout the United States.  The No-Poach Agreement is *per se* illegal under the federal antitrust laws, and thus, there is no requirement to define the relevant product or geographic markets.  As the DOJ made clear in guidance it issued in 2016: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws."[2]  For avoidance of doubt, the relevant market is the services of aerospace Engineers in the United States and its territories.

37.     The aerospace companies are characterized by high barriers to entry and specialized work.  In a competitive labor market, Defendants would aggressively compete for Engineers by recruiting and hiring from each other and the small pool of candidates would result in higher wages and better benefits.  This includes lateral recruiting, as a company seeking to hire a new employee will lessen the risks associated with that hire by seeking to hire a rival's employee.

---

[1]     *See* Dep't of Justice Antitrust Div. and Fed. Trade Comm'n, *Antitrust Guidance for Human Resource Professionals*, at 4 (Oct. 2016), https://www.justice.gov/atr/file/903511/download (last visited Jan. 31, 2022).

[2]     Dep't of Justice Antitrust Div. and Fed. Trade Comm'n, *supra* n.1 at 3.

38.     Absent their No-Poach Agreement, Defendants would have retained their Engineers by paying a wage which would have reduced the necessity of seeking other employment. Preemptive retention measures would naturally have led to increased compensation for all Engineers.

39.     Beginning at least as early as 2011 and continuing through the present, Defendants agreed not to compete for each other's Engineers in the aerospace industry working on projects for P&W, specifically by agreeing to restrict the hiring and recruiting of Engineers between and among Suppliers in the United States.

40.     As the ultimate client, P&W enforced and mediated the illegal agreement.  P&W did so largely through defendant Patel – a manager and later the director of the unit within P&W in charge of managing relationships with Suppliers.

41.     The No-Poach Agreement restricted the free movement of Engineers within the aerospace engineering industry.  The No-Poach Agreement thus artificially extended Engineers' length of work at a given employer and/or reduced or eliminated their ability to advocate and obtain better terms of employment, including compensation.

42.     The hiring and recruiting restrictions that make up the No-Poach Agreement were shaped by Defendants' shared financial motivations, specifically a desire to suppress wages and thereby lessen labor costs.

43.     Patel instructed managers and executives at Suppliers that P&W's Suppliers should not be recruiting and hiring one another's Engineers.

44.     The Suppliers understood that these restrictions applied mutually among the Suppliers themselves.

45.     Patel made these communications with each of the Suppliers directly, communicating the restriction and that other Suppliers were observing it as well.

46.     For example, in 2017, Patel emailed the COO, Executive V.P. and part owner of PSI ("Co-Conspirator 7" from the DCIS Affidavit).  He stated: "'Last time we talked you assured me that you will not hire any [P&W] partners employee.  This must stop, otherwise others will also start poaching your employees.'"  DCIS Affidavit, ¶29.

47.     Patel also discussed these restrictions on Suppliers' recruiting and hiring when multiple Suppliers were present.  For example, in December 2015, P&W hosted a dinner that was attended by Patel and senior representatives from Suppliers for P&W, including QuEST, Belcan, and Cyient.  December 15 Indictment, ¶22(a).  Patel addressed the Supplier representatives at the dinner, during which he instructed the attendees that there should be no poaching of one another's Engineers.  These instructions were disseminated to others at the Supplier companies.  For example, following the meeting, an executive of Belcan, who was in attendance at the dinner, sent an email to defendant Houghtaling and other Belcan employees, summarizing Patel's remarks: "'Mahesh did take the stage at the end . . . no poaching of each others' [sic] employees.'"  December 15 Indictment, ¶22(a).

48.     Defendants discussed the No-Poach Agreement directly with one another.  For example, in September 2019, after Agilis had hired four Cyient employees, the President for Cyient's North America Operations reached out to the Founder, President, and Chief Executive Officer of Agilis, and asked him to stop "'actively recruiting'" Cyient's employees.  DCIS Affidavit, ¶34.  Agilis's CEO agreed, telling Cyient's President of North America Operations that Agilis's "'general aim is NOT to recruit from the local "competition" because no one wins; salaries rise, the workforce get unstable, and our margins all get hurt.'"  *Id.*  In response, Cyient's head of North America Operations thanked Agilis's CEO and noted "'I flat out ask our teams not to hire people from the other [P&W] suppliers.'"  *Id.*

49.     P&W threatened to cut off Defendants from P&W's business if they violated the Agreement.  December 15 Indictment, ¶26.  For example, in June 2018, a series of emails and conversations between defendant Patel and individuals from Belcan, including defendant Houghtaling, discussing Belcan's employment offer to an engineer at QuEST.  *Id.*  The discussion concluded with a Belcan executive telling Patel "'[p]er our conversation yesterday, this email is to confirm that we have rescinded the offer letter for'" the engineer being discussed.  *Id.*

50.     Defendants' joint interest in suppressing labor costs was effectuated by the conspiracy.  In January 2017, after chastising Prus for PSI making an employment offer to an employee of Cyient, Patel contacted another representative of PSI, copying Prus, and instructed: "'Please do not hire any partners [sic] employee, whether they approached or you approached.  That is the only way we can pre[v]ent poaching and price war.'"  December 15 Indictment, ¶27(b); DCIS Affidavit, ¶24.

51.     In March of 2016, that individual discussed P&W's hiring restrictions with an executive of another Supplier, noting that "'MAHESH says he does not want the salaries to increase.'"  DCIS Affidavit, ¶24.

52.     In April of 2017, a General Manager from QuEST sent an email warning that Cyient had hired an Engineer who was employed with QuEST, noting that "'[t]his is against our agreements with our employees and against our known expectations of [P&W] for the cooperation of the outsource companies'" and complaining that if such hiring does not stop, it will "'drive the price structure up.'"  December 15 Indictment, ¶27(c); DCIS Affidavit, ¶25.  Defendant Patel subsequently contacted executives of the two Suppliers involved – the General Manager from QuEST and the President of North America Operations from Cyient – and invited them for a "'private discussion'" in his office the next day.  DCIS Affidavit, ¶25; December 15 Indictment, ¶29(g).

53.     A September 2019 example shows that in addition to using Patel as a conduit, Defendants discussed the No-Poach Agreement directly with each other.  After learning that Agilis hired employees from Cyient, defendant Edwards emailed the CEO of Agilis to request adherence to the hiring and recruiting restrictions.  December 15 Indictment, ¶27(a).  In the email, Edwards stated, "'I wanted to ask if your team could refrain from actively recruiting our [Cyient] employees going forward.'"  *Id.*  Edwards further assured Agilis's CEO, "'I flat out ask our teams not to hire people from the other [P&W] suppliers.'"  *Id.*  The Agilis CEO assured Edwards, "'[o]ur general aim is NOT to recruit from the local "competition" because no one wins; salaries rise, the workforce get [sic] unstable, and our margins all get hurt.'"  *Id.*

54.     The Defendants and their co-conspirators monitored and enforced compliance with their illegal agreement by among other means: (1) investigating whether employees were seeking employment with or had been offered employment by another co-conspirator; (2) alerting co-conspirators, through direct communications in which Patel served as an intermediary, to instances in which those co-conspirators hired and recruited in a manner that violated the agreement; and (3) demanding through direct communications and communications in which Patel served as an intermediary, that co-conspirators cease hiring and recruiting in a manner that violated the agreement. December 15 Indictment, ¶28.

55.     For example, in February 2015, after Cyient hired an employee of QuEST, defendant Edwards emailed another Cyient executive, stating, "'I let Mahesh know this happened – [a]nd we are still looking into how exactly this happened.'"  December 15 Indictment, ¶25(c).  Edwards continued, "'can you let Mahesh know the actions we're taking to prevent this from happening again?'"  *Id.*

56.     As another example, in May 2016, defendant Houghtaling was informed by a colleague that "'[a]nother employee'" had been hired by PSI to work on an outsourcing project for a

company other than P&W.  December 15 Indictment, ¶22(c); DCIS Affidavit, ¶27.  The colleague

asked Houghtaling if he "'ever discuss[ed] the last one with Mahesh.'"  December 15 Indictment,

¶22(c); DCIS Affidavit, ¶27.  Houghtaling assured the colleague that he had spoken to Patel and that

Patel "'said he'd talk to [PSI] about it.'"  December 15 Indictment, ¶22(c); DCIS Affidavit, ¶27.

Houghtaling subsequently emailed defendant Patel to complain that his company was "'losing

another employee to [PSI],'" and named the employee.  December 15 Indictment, ¶22(c); DCIS

Affidavit, ¶27.

57.     In September 2016, a Belcan executive alerted Patel to a recent poaching by PSI.

December 15 Indictment, ¶28(e).  An email from Patel to defendant Prus followed in which Patel

stated, "'***[y]ou had assured me*** that [PSI] will never soliciting [sic] [P&W's] long term partners [sic]

employees. . . .  Please send me in writing that proper steps has [sic] taken place to curtail this

practice.'"  December 15 Indictment, ¶28(e) (emphasis in original).  In response to Patel's

reprimand, Prus instructed a PSI employee by email to "'[p]lease stop speaking to any [Belcan] or

other [P&W] supplier companies about transitioning to a [PSI] Office immediately.'"  December 15

Indictment, ¶28(e).

58.     A few months later, the reverse unfolded.  In November 2016, defendant Prus

emailed Patel complaining about Belcan "'actively [r]ecruiting [PSI] employees.'"  December 15

Indictment, ¶22(d); DCIS Affidavit, ¶27.  Patel forwarded Prus's email to defendant Houghtaling

and another Belcan manager, saying, "'[w]e must not poach each other partners employee.  Please

communicate to [Belcan] HR not to interview or hire active employees working on [P&W] work.'"

December 15 Indictment, ¶22(c); DCIS Affidavit, ¶27.  In another November 2016 email, Prus wrote

to another executive at PSI, "'[n]eed to have a conversation with [a [Belcan] manager] about them

actively recruiting [PSI] employees.  We do not EVER call their employees.'"  December 15

Indictment, ¶28(g).  Later that day, the PSI executive responded to Prus, "'I talked to him.  He will

talk to recruiting . . . .'"  *Id.*

59.     As another example, in a February 2017 email, defendant Wasan responded to the

news that Belcan had made an employment offer to a QuEST engineer by stating: "'[Belcan] is not

allowed to poach any of our employees and I will plan to block this immediately.  I will send this to

Mahesh today.'"  December 15 Indictment, ¶22(b).  Defendant Wasan forwarded the information

about Belcan's offer directly to defendant Patel, adding, "'I am very concerned that [Belcan]

believes they can hire any of our employees. . . .  Could you please stop this person from being hired

by Belcan?'"  December 15 Indictment, ¶22(b); DCIS Affidavit, ¶28.

60.     Further, in January 2017, a representative from Cyient emailed Patel to inform him

that PSI had hired a Cyient Engineer and Patel forwarded this email to defendant Prus.  December 15

Indictment, ¶25(b); DCIS Affidavit, ¶29.  Patel wrote: "'Last time we talked you assured me that

you will not hire any [P&W] partners employee [sic].  This must stop, otherwise others will also start

poaching your employees.  Please advise.'"  December 15 Indictment, ¶25(b); DCIS Affidavit, ¶29.

Defendant Prus subsequently forwarded the email to a PSI recruiting employee and said, "'[p]lease

make sure we stay away from [Belcan], [Cyient], [Agilis] personnel moving forward.'"  December

15 Indictment, ¶25(b).

61.     In December 2017, a V.P. from QuEST emailed defendant Houghtaling complaining

about Belcan's reported employment offers to two QuEST employees in Illinois and stated, "'I

would like to understand if you are planning to address this immediately, or I will be forced to

escalate to our mutual customers.'"  December 15 Indictment, ¶28(f).  Defendant Harvey responded,

"'[s]pot on.  This cannot be tolerated!  We need to move quickly and forcibly when this is about to

happen.'"  *Id.*  Later, he added, speaking to QuEST's management and executive team: "'[p]ush hard

to have it reversed and consequences for [Belcan].'"  *Id.*

62.     Patel's enforcement of the agreement on behalf of the Suppliers was effective in ensuring that the Suppliers adhered to the terms of the agreement.

63.     For example, after a Belcan executive notified Patel that PSI was recruiting and hiring Engineers in violation of the agreement, Patel sent an email to the Executive V.P. and part owner of PSI.  Referencing Belcan, Patel wrote: "'You had assured me that [PSI] will never soliciting [sic] [P&W's] long term partners [sic] employees . . . Please send me in writing that proper steps has [sic] taken place to curtail this practice.'"  DCIS Affidavit, ¶31.  In a later email, the Executive V.P. and part owner of PSI indicated that he understood Belcan was the source of this complaint, writing that Belcan "'is making a big stink right now over any solicitations.'"  *Id.*  The Executive V.P. and part owner of PSI subsequently instructed another employee of PSI to "'[p]lease stop speaking to any [Belcan] or other [P&W] supplier companies about transitioning to [a PSI] Office immediately.'"  *Id.*

64.     At least as early as January 2016, well before several of the examples of unlawful conduct described herein, certain managers and executives at Belcan began raising concerns with Patel that the conduct of P&W and the Suppliers was unlawful, specifically because they violated the antitrust laws.

65.     Early in January 2016, a General Manager for Belcan received an email describing a civil lawsuit in which several major companies were accused of (as the Belcan employee forwarding the email put it) "'engaging in illegal anti-poaching agreements . . . . . . the companies involved had promised each other not to actively recruit employees from one another.'"  *Id.*, ¶35.  The General Manager subsequently planned a meeting with Patel in which one of the items for discussion was "'[i]nformal poaching agreement between outsource suppliers.  Recent Apple lawsuit because these agreements are illegal.'"  *Id.*, ¶36.

66.     In a series of emails, Belcan's Human Resources Director and the General Manager discussed an upcoming call with Patel, which was planned concerning a recent allegation that Belcan had hired an Engineer from QuEST in violation of the No-Poach Agreement.  The HR Director noted her concern that "'there is an anti-trust issue by us turning people away solely based on their previous employer.'"  DCIS Affidavit, ¶37.  The General Manager acknowledged these concerns about illegality in a subsequent email to the HR Director, noting "'[P&W] (Mahesh Patel) is asking (insisting) that we not interview anyone currently employed by our competitors . . .  I'm not sure if this is legal, but that is what they are requesting we do.'"  DCIS Affidavit, ¶37.  The next day, Belcan's HR Director reported that she and another Belcan manager "'spoke with Mahesh this afternoon.  He understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors.'" DCIS Affidavit, ¶37.

67.     As part of and to effectuate the No-Poach Agreement, P&W and QuEST agreed to restrict P&W's hiring and recruiting of Engineers from QuEST.  P&W and QuEST did so through two primary means: (1) setting a two-year tenure restriction for any QuEST Engineers hired by P&W; and (2) hiring freezes.

68.     In September 2011, defendant Harvey, along with a QuEST account manager, attended a dinner with Patel and a P&W V.P. to whom Patel directly reported.  December 15 Indictment, ¶24(a); DCIS Affidavit, ¶42.  The objectives of the dinner included a discussion of the QuEST executive's proposal concerning tenure.  December 15 Indictment, ¶24(a); DCIS Affidavit, ¶42.

69.     The day following that dinner, defendant Harvey sent an email to the attendees, stating: "'We truly appreciate and value our strategic relationship. . . .  I thought I would take the lead in summarizing what we discussed last night and proposed next steps . . . .'"  DCIS Affidavit,

¶42; December 15 Indictment, ¶24(a).  The first item on the list was "'personnel transfers.'" December 15 Indictment, ¶24(a); DCIS Affidavit, ¶42.  Defendant Harvey described this as "'the new policy/guidelines'" that the P&W V.P. had reviewed at the dinner, which set a "'min. 24 months'" period for such "'personnel transfers.'"  December 15 Indictment, ¶24(a); DCIS Affidavit, ¶42.  Harvey further indicated that Patel had advised that he limit the written record on this agreement, noting that, "'[f]ollowing Mahesh's previous counsel, [he would] not go[] into detail in writing on this subject.'"  DCIS Affidavit, ¶42.

70.     Subsequently, starting in late 2011, managers and executives from QuEST communicated with Patel and others in his outsourcing management group at P&W concerning maintenance and enforcement of this agreement.  December 15 Indictment, ¶24(a); DCIS Affidavit, ¶43.  Specifically, these managers and executives worked to reconfirm, maintain, and enforce this agreement and to block or attempt to block P&W's recruiting and hiring of those QuEST employees covered by the agreement.  DCIS Affidavit, ¶43.

71.     By way of example, in October 2012, one QuEST employee wrote to Patel concerning an employee about whom Patel had inquired, stating: "'[Employee's] tenure at [QuEST] dates to May 2011.  Based on our agreement of two year minimum tenure, we would ask that [P&W] not pursue employment of [him] at this time.'"  DCIS Affidavit, ¶44.

72.     In June 2015, Patel emailed managers from QuEST, stating that P&W "'is interested in interviewing and hiring'" two QuEST Engineers and asking that QuEST "'[p]lease provide your concurrence.'"  DCIS Affidavit, ¶45.  One of the QuEST managers responded that, while one of the Engineers had worked at QuEST for four and a half years and "'meets requirements,'" the other "'only has 8 months and does not meet obligation, so [QuEST] cannot provide concurrence.'"  *Id.*

73.     Additionally, in April 2017, two QuEST managers, discussing a P&W request to hire a certain QuEST Engineer, noted in an internal email that this employee "'wouldn't meet our

requirements for two years.'"  DCIS Affidavit, ¶46; December 15 Indictment, ¶24(b).  Two days later, one of those managers emailed Patel to inform him that the employee "'does not meet tenure requirements.'"  DCIS Affidavit, ¶46; December 15 Indictment, ¶24(b).  Patel in turn told a P&W employee: "'[QuEST] will not release him . . . He has not completed 2 [y]ears as our verbal agreements.'"  DCIS Affidavit, ¶46; December 15 Indictment, ¶24(b).

74.     In furtherance of the conspiracy, representatives of QuEST and Patel also agreed upon periodic freezes of P&W's recruiting and hiring of any QuEST employees, with limited exceptions.

75.     These hiring freezes took place from approximately 2015 through 2017 and ranged from several months to nearly an entire year in 2016.  Each began when QuEST managers and executives petitioned Patel to limit or stop hiring from QuEST.  DCIS Affidavit, ¶47.

76.     For example, in January 2016, Wasan reported to QuEST's Chief Engineer/Account Manager and another colleague that "'I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring.  Also I am going to tell him that he needs to block'" two QuEST Engineers "'from being hired until we come to an agreement on the acceptable limit to hire [from] our team.'"  December 15 Indictment, ¶23(a); DCIS Affidavit, ¶49.

77.     Defendants' conspiracy suppressed the compensation (including salaries, wages, and benefits) offered and paid to their employees while restricting the employment opportunities available to them.

78.     All Defendants competed for a limited supply of qualified aerospace Engineers.  Absent the conspiracy, Defendants would compete to recruit, hire, and retain top aerospace Engineers, including by directly soliciting competitors' employees with better offers.

79.     Defendants' conspiracy cut off the free flow of information within the aerospace engineering labor market, allowing Defendants to keep costs down by obscuring or eliminating the availability of better opportunities elsewhere.

80.     Direct solicitation from competing employers benefits individual employees because competing employers may make offers that exceed an employee's current compensation.  That employee can then secure additional compensation by either changing employers or negotiating increased compensation from their current employer.  In addition, employees often share information about offers, which can incent other employees to negotiate with their employers or seek similar or better terms from their current employers.

81.     Defendants' conspiracy also cut off the free flow of information to employers who might otherwise have increased compensation to compete in the labor market.  Firms that directly solicit competitors' employees will learn whether their offered compensation is sufficient to lure its competitors' employees or not, and they are likely to increase compensation offers to ensure they remain competitive.  Similarly, firms that learn that their compensation is lower than competitors may preemptively increase compensation in order to avoid losing employees to poaching.

82.     Defendants' conspiracy successfully controlled labor costs by stifling competition for engineering and other skilled labor, suppressing compensation to their employees, and restricting the free movement of those employees by eliminating new employment opportunities.

83.     Defendants actively concealed their illegal No-Poach Agreement from the public and the proposed Class.  Defendants did not disclose the existence of the No-Poach Agreement to their Engineers or to the public.  As further alleged above, however, Defendants would monitor and enforce each other's compliance with the No-Poach Agreement.

84.     The nature of the No-Poach Agreement ensures it would remain largely undetected by Engineers and the public.  Defendants entered into the No-Poach Agreement orally (the existence of

which various emails confirm), affirmatively avoiding memorializing the No-Poach Agreement in a written agreement despite its broad application and multi-year duration, opting instead to inform new executives about the No-Poach Agreement's existence on a primarily oral basis. The reason for this practice was to avoid alerting the public and the proposed Class of the No-Poach Agreement's existence and, thus, to deter potential investigations, litigation, and to perpetuate the Agreement's illegal effects.

85.     Defendants took affirmative steps to conceal the existence and operation of the conspiracy. December 15 Indictment, ¶29. Among other things, the Defendants agreed that their conspiracy remain an unwritten understanding and not reflected in master terms agreements or other formal written agreements between P&W and co-conspirators. December 15 Indictment, ¶29. Further, with respect to defendant Wasan and other Defendants, they often provided false and misleading information to Engineers and other skilled-labor workers regarding the existence of the agreement and the worker's ability to obtain employment at other co-conspirator companies, including by communicating that employment at other co-conspirator companies was unavailable to them because of noncompete agreements rather than the conspiratorial agreement. *Id.*

86.     For example, in a September 2011 email from defendant Harvey to Patel and co-conspirators, Harvey stated, "'[f]ollowing Mahesh's previous counsel, I am not going into detail in writing'" on the subject of the agreement by P&W not to hire certain employees from QuEST. December 15 Indictment, ¶29(e).

87.     In a January 2015 statement by a QuEST manager to defendant Harvey and two other QuEST executives regarding his recent discussion with defendant Houghtaling about ceasing poaching between QuEST and Belcan, the QuEST manager stated, "'[w]hile I want you to be informed, I would rather not have any other folks know where this info came from. I request that this email not be forwarded.'" December 15 Indictment, ¶29(f).

88.     Indeed, the DCIS Affidavit found that, although some individuals heard rumors of the agreement, in many instances even victim-witnesses were unaware of the actions taken by Defendants to block their job applications.  DCIS Affidavit, ¶54.  Moreover, the far-reaching impact of the restrictions on recruiting and hiring, which extends to those Engineers who had not directly applied for employment with another one of Defendants, ensures that the vast majority of the Class, including Plaintiff, were unaware of the No-Poach Agreement and could not learn of its existence through reasonable inquiry because of Defendants' active concealment of the agreement.

89.     But for information made public in the DCIS Affidavit, Plaintiff would have remained unaware that the No-Poach Agreement existed.  Because of the secrecy of the No-Poach Agreement and Defendants' acts of concealment, Plaintiff and the Class did not and could not have known before December 9, 2021, when the DOJ filed its partially unsealed criminal complaint and arrest warrant for defendant Patel, that Defendants were engaged in an illegal conspiracy to suppress Engineers' wages by restraining recruitment and hiring of one another's Engineers.  Further, the secrecy of the No-Poach Agreement and Supplier Defendants' acts of concealment would have thwarted any reasonable effort to discover the No-Poach Agreement before that date.

## CLASS ACTION ALLEGATIONS

90.     Plaintiff brings this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Class (the "Class").  The Class is defined as:

> All natural persons who worked at one or more of the Defendants as Engineers from January 2011 through such time as Defendants' anticompetitive conduct ceased ("Class Period").  Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States government.

91.     Plaintiff does not yet know the exact size of the Class because such information is in the exclusive control of Defendants.  Based upon publicly available information, there are thousands of Class members.  Joinder of all members of the Class is therefore impracticable.

- 21 -

92.     Class members are easily ascertainable based on, among other things, the Defendants' employment records.

93.     Members of the Class are so numerous that joinder is impracticable.  Further, the Class is readily identifiable from information and records in Defendants' possession.

94.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants as a result of Defendants' wrongful conduct.

95.     Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

96.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with class action antitrust litigation in the online advertising industry.

97.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.  Questions common to the members of the Class include:

(a)     whether Defendants entered into a No-Poach Agreement to restrict competition in the labor market in which Plaintiff and other Class members sold their services;

(b)     the identity of the participants in the conspiracy;

(c)     whether Defendants violated §1 of the Sherman Act, 15 U.S.C. §1;

(d)     whether Plaintiff and the Class have suffered antitrust injury;

(e)     whether the activities of Defendants as alleged herein have substantially affected interstate commerce; and

(f)     the appropriate measure of damages and relief.

98.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.   The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

99.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## COUNT

### (For Violation of §1 of the Sherman Act, 15 U.S.C. §1, Against All Defendants)

100.     Plaintiff incorporates the preceding paragraphs by reference.

101.     Defendants knowingly, intentionally, and cooperatively engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of §1 of the Sherman Act, 15 U.S.C. §1.  Specifically, Defendants agreed to restrict competition for Class members' services through a No-Poach Agreement with the purpose and effect of suppressing Class members' compensation and potential job opportunities and restraining competition in the market for Class members' services.

102.     Defendants' conduct injured Plaintiff and other Class members by depriving them of free and fair competition in the market for their services.

103.     Defendants' No-Poach Agreement is a *per se* violation of §1 of the Sherman Act.

104.     As a direct and proximate result of Defendants' violations of §1 of the Sherman Act, 15 U.S.C. §1, Plaintiff and the Class have received compensation that is less than they would have received had the market for their services been competitive.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter a final judgment against each of the Defendants as follows:

A.      That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as a representative for the Class, and that Plaintiff's counsel be appointed as counsel for the Class;

B.      That the unlawful conduct alleged herein be adjudged and decreed to violate §1 of the Sherman Act, 15 U.S.C. §1;

C.      That Defendants, their affiliates, successors, transferees, assignees and other officers, directors, and partners, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from, in any manner, continuing, maintaining, or renewing the conduct alleged herein, or from entering into any other contract or engaging in any other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      An award of monetary damages, including treble damages, punitive damages, the costs of this action, and reasonable attorneys' fees pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26;

E.      An award of pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

F.      An award of such other relief as may be appropriate and as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

DATED:  February 1, 2022

DISERIO MARTIN O'CONNOR
   & CASTIGLIONI LLP
JONATHAN P. WHITCOMB (CT 15014)


*s/ Jonathan P. Whitcomb*

JONATHAN P. WHITCOMB

1010 Washington Boulevard, Suite 800
Stamford, CT  06901
Telephone:  203/358-0800
203/348-2321 (fax)
jwhitcomb@dmoc.com

Liaison Counsel

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID W. MITCHELL
BRIAN O. O'MARA
STEVEN M. JODLOWSKI
LONNIE A. BROWNE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)
davidm@rgrdlaw.com
bomara@rgrdlaw.com
sjodlowski@rgrdlaw.com
lbrowne@rgrdlaw.com

Attorneys for Plaintiff